# United States District Court

**EASTERN** District of **CALIFORNIA**

FILED
Aug 14, 2026
CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

In the Matter of the Seizure of
(*Briefly describe the property to be seized*)

Approximately 195,856.574417 USDT on the Tron blockchain held at wallet address TBM4XM16L7vSsG5Kmtc8TktUDriWBswvgT.

## APPLICATION FOR A WARRANT TO SEIZE PROPERTY SUBJECT TO FORFEITURE

CASE NUMBER: 2:26-sw-0741 CKD

I, a federal law enforcement officer or attorney for the government, request a seizure warrant and state under penalty of perjury that I have reason to believe that the following property in the Eastern District of CALIFORNIA is subject to forfeiture to the United States of America (*describe the property*):

Approximately 195,856.574417 USDT on the Tron blockchain held at wallet address TBM4XM16L7vSsG5Kmtc8TktUDriWBswvgT.

The property is subject to seizure pursuant to 18 U.S.C. § 981(b), and subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and 981(a)(1)(C), and 21 U.S.C. § 881(a)(6), concerning violations of 18 U.S.C. §§ 1956 and 1957, and 21 U.S.C. § 841(a)(1).

The application is based on these facts:

**See attached affidavit.**

☒ Continued on the attached sheet.

/s/
*Applicant's signature*

Peter A. Borges, Special Agent, DEA
*Printed name and title*

Sworn to before me and signed telephonically.

August 14, 2026 at 3:57 pm
Date

[signature]
*Judge's signature*

Sacramento, California
City and State

Carolyn K. Delaney, U.S. Magistrate Judge
*Printed name and title*

ERIC GRANT
United States Attorney
CHARLES CAMPBELL
KEVIN C. KHASIGIAN
Assistant U.S. Attorneys
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>VIRTUAL CURRENCY STORED WITHIN, OR ASSOCIATED WITH, VIRTUAL CURRENCY ADDRESS UUID: 5E59B7C3-3200-5D02-8C71-B4E7952196BC AT COINBASE, ET AL.,<br><br>Defendants. | AFFIDAVIT IN SUPPORT OF SEIZURE WARRANTS |

I, Peter A. Borges, being first duly sworn, hereby depose and state as follows:

## I. INTRODUCTION

1. This Affidavit is made to support the seizure of cryptocurrency wallet addresses, a cryptocurrency exchange account, a Wells Fargo bank account, and a Polaris recreational vehicle connected to a narcotics distribution and money laundering scheme operating out of Turlock, California. The scheme functioned by selling narcotics to customers through online platforms, coordinating transactions remotely, and shipping drugs from the Turlock area to destinations across the United States. Many customers paid with cryptocurrency—specifically by transferring Bitcoin to wallet addresses provided by members of the conspiracy. As detailed below, this affidavit establishes probable cause to seize the cryptocurrency proceeds received by the Turlock, CA-based traffickers in exchange for the

controlled substances they distributed nationwide.

2. On April 9, 2026, three participants in the scheme—Jessy JOHNSON, Jose MENDOZA, and Alejandro PEREZ (collectively, the "MENDOZA DTO")—were charged by indictment in Case No. 2:26-CR-00045-TLN with conspiracy to distribute controlled substances and possession with intent to distribute cocaine, MDMA, methamphetamine, and psilocybin. The indictment also included a forfeiture allegation seeking the forfeiture of cash seized from the coconspirators, a Coinbase account containing cryptocurrency derived from narcotics sales, and Bitcoin and stablecoins connected to this DTO's conspiracy.

3. During the March 26, 2026, execution of search warrants of JOHNSON's residence and two other locations connected to the scheme, the DEA, with partnering agencies, seized over $250,000 in cash and approximately 422 pounds of methamphetamine in the form of counterfeit Adderall pills, approximately 41 kilograms of cocaine, approximately 112 pounds of MDMA, approximately 11 kilograms of ketamine, approximately 52 kilograms of counterfeit Xanax, and various other controlled substances. The DEA and partnering agencies also executed seizure warrants for seven bank accounts and four vehicles connected to the scheme. See, e.g., Case No. 2:26-SW-00266-AC. All the facts stated in those Affidavits supporting the search and seizure warrants remain true and are fully incorporated by this reference.

4. The assets subject to seizure through this affidavit are set forth below:[1]

a) Virtual Currency Stored Within, or Associated With, Virtual Currency Address UUID: 5e59b7c3-3200-5d02-8c71-b4e7952196bc at Coinbase,
b) Approximately 150,013 USDT (Tether) held at wallet address **TGDY**Ccp3cxpFcrrR52VHUNpSfS8EcTsvkm,
c) Approximately 152,069 USDT (Tether) held at wallet address **TAU6**5dv1aAZKNZSfxmjP3bq7uBgjaZkQnp,
d) Approximately 204.6966 TRON (TRX) on the Tron blockchain held at wallet address **TSbT**8bxAny77Bt4Hz7fccH6duSz5dmK3Fe,
e) Approximately 3,658.2372 TRX on the Tron blockchain held at wallet address **TBM4**XM16L7vSsG5Kmtc8TktUDriWBswvgT,
f) Approximately 767.26294 TRX on the Tron blockchain held at wallet address **TLmg**Z3dfUfMnHBXo83QgrEpLAe6BL3i7Ja,
g) Approximately 150,050.00 USDT on the Tron blockchain held at wallet address **TSbT**8bxAny77Bt4Hz7fccH6duSz5dmK3Fe,
h) Approximately 195,856.574417 USDT on the Tron blockchain held at wallet

[1] For ease of identification, the first four characters of each address are bolded and serve as shorthand references throughout this affidavit. Further, the affidavit's Attachment A-1 contains a chart listing the addresses and their corresponding four-character identifier, which may be separated and used as a quick reference while reviewing this affidavit.

address **TBM4**XM16L7vSsG5Kmtc8TktUDriWBswvgT,

i) Approximately 25,499.791 USDT on the Tron blockchain held at wallet address **TLmg**Z3dfUfMnHBXo83QgrEpLAe6BL3i7Ja,

j) Approximately 0.14688238 Bitcoin,

k) Approximately 0.14271276 Bitcoin,

l) All funds maintained in Wells Fargo Bank account number 7829573299, held in the name of Big Tyme Auto Repair Inc., and

m) 2021 Polaris RZR, VIN: 3NSR4E928MG629177, License Plate Number FW7P18.

5. As set forth in further detail below, there is probable cause to seize the aforementioned assets.

## II. AGENT BACKGROUND

6. I am a Special Agent with the Drug Enforcement Administration (DEA), and have been since February 10, 2025. I am an "investigative or law enforcement officer" of the United States within the meaning of 18 U.S.C. § 2510(7), in that I am an officer of the United States empowered by law to conduct criminal investigations and make arrests for offenses enumerated in 18 U.S.C. § 2516.

7. I trained to be a Special Agent at the DEA Academy, Quantico, Virginia. At the DEA Academy, I received special training in the Controlled Substances Act, Title 21 United States Code, including, but not limited to, Sections 841 and 846, Controlled Substance Violations and Conspiracy to Commit Controlled Substance Violations, respectively. I also received special training regarding criminal organizations engaged in conspiracies to manufacture and/or possess with intent to distribute fentanyl, counterfeit pharmaceutical tablets, ecstasy/MDMA, methamphetamine, cocaine, cocaine base, heroin, marijuana, and other illicit drugs. I received further training in search and seizure law and many other facets of drug law enforcement including clandestine laboratory investigations.

8. As a DEA agent, I have assisted in the execution of many search warrants for controlled substances and related paraphernalia, indicia, and other evidence of violations of federal drug statutes. I have participated in multiple investigations targeting individuals and organizations trafficking fentanyl, counterfeit pharmaceutical tablets, ecstasy/MDMA, cocaine, heroin, marijuana, methamphetamine, and other drugs. During these investigations, I have become familiar with the many ways drug traffickers use vehicles, often cars, to conduct their illegal operations.

9. During my time as a Special Agent with the DEA, I have been the case agent and assisted other agents and officers in investigating violations of both federal and state laws pertaining to drug

trafficking. I have investigated cases involving the possession or sale of controlled substances. Throughout my law enforcement career, I have become familiar with, and have participated in, conventional investigative methods, including, but not limited to, electronic surveillance, visual surveillance, questioning of witnesses, search warrants, confidential informants, pen registers, trap and trace, and vehicle tracker device installation and surveillance.

10. Also, during my time as a Special Agent with the DEA, I have attended reoccurring training regarding conventional surveillance, electronic surveillance, cryptocurrency, wires, and various others.

11. The facts in this affidavit come from my personal observations, my training and experience, and information and reports obtained from other agents and witnesses. Since this Affidavit is being submitted for the limited purpose of demonstrating probable cause, I have not included each and every fact known to me concerning this investigation.

## III. <u>RELEVANT STATUTES</u>

12. Under the Controlled Substances Act, it is unlawful, "[e]xcept as authorized[,] . . . for any person knowingly or intentionally . . . to manufacture, distribute, or dispense . . . a controlled substance." 21 U.S.C. § 841(a)(1).

13. Pursuant to 21 U.S.C. § 881(a)(4), any vehicle used, or intended to be used, to transport, conceal, or facilitate the distribution of controlled substances is subject to forfeiture.

14. Pursuant to 21 U.S.C. § 881(a)(6), "[a]ll moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this chapter."

15. Under 18 U.S.C. § 1956, it is unlawful to conduct or attempt to conduct a financial transaction involving the proceeds of specified unlawful activity “knowing that the transaction is designed in whole or part— (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.”

16. Under 18 U.S.C. § 981(a)(1)(A), any property, real or personal, involved in a transaction

or attempted transaction in violation of section 18 U.S.C. § 1956, or any property traceable to such property, is forfeitable on that basis.

17. Section 981(b)(3) of Title 18 provides that a seizure warrant may be issued by a "judicial officer in any district in which a forfeiture action against the property may be filed under [28 U.S.C. § 1355(b)] and may be executed in any district in which the property is found [.]" Under 21 U.S.C. § 853(l), incorporated by 18 U.S.C. § 982(b)(1), "[t]he district courts of the United States shall have jurisdiction to enter orders as provided in this section without regard to the location of any property which may be subject to forfeiture[.]"

## IV. CRYPTOCURRENCY OVERVIEW

18. Cryptocurrency, a type of virtual currency, is a decentralized, peer-to-peer, network-based medium of value or exchange that may be used as a substitute for fiat currency to buy goods or services or exchanged for fiat currency or other cryptocurrencies. Examples of cryptocurrency include Bitcoin "BTC" and Ether "ETH". Cryptocurrency can exist digitally on the Internet, in an electronic storage device, or in cloud-based servers. Although not usually stored in any physical form, public and private keys (described below) used to transfer cryptocurrency from one person or place to another can be printed or written on a piece of paper or other tangible object.

19. Cryptocurrency can be exchanged directly person to person, through a cryptocurrency exchange (i.e., online companies which allow individuals to purchase or sell cryptocurrencies in exchange for fiat currencies or other cryptocurrencies), or through other intermediaries. Generally, cryptocurrency is not issued by any government, bank, or company; it is instead generated and controlled through computer software operating on a decentralized peer-to-peer network. Most cryptocurrencies have a "blockchain," which is a distributed public ledger, run by the decentralized network, containing an immutable and historical record of every transaction.

20. Cryptocurrency is stored in a virtual account called a wallet. Wallets are software programs that interface with blockchains and generate and/or store public and private keys used to send and receive cryptocurrency. A public key or address is akin to a bank account number, and a private key is akin to a PIN number or password that allows a user the ability to access and transfer value associated with the public address or key.

21. To conduct transactions on a blockchain, an individual must use the public address (or "public key") and the private address (or "private key.") A public address is represented as a case-sensitive string of letters and numbers, 26–35 characters long. Each public address is controlled and/or accessed through the use of a unique corresponding private key—the cryptographic equivalent of a password or PIN—needed to access the address. Only the holder of an address' private key can authorize any transfers of cryptocurrency from that address to another cryptocurrency address.

22. The following are cryptocurrency definitions, some of which are included throughout this investigation and in this affidavit:

23. Stablecoins: Stablecoins are a type of virtual currency whose value is pegged to a commodity's price, such as gold, or to a fiat currency, such as the U.S. dollar, or to a different virtual currency. For example, USDT is a stablecoin pegged to the U.S. dollar. Stablecoins achieve their price stability via collateralization (backing) or through algorithmic mechanisms of buying and selling the reference asset or its derivatives.

24. Tether: Tether International S.A. de C.V. ("Tether") is the company that manages the smart contracts and the treasury (i.e., the funds held in reserve) for USDT tokens.

25. Bitcoin: Bitcoin (or "BTC") is a type of virtual currency. Unlike traditional, government-controlled currencies (i.e., fiat currencies), such as the U.S. dollar, Bitcoin is not managed or distributed by a centralized bank or entity. Because of that, Bitcoin can be traded without the need for intermediaries. Bitcoin transactions are approved/verified by computers running Bitcoin's software. Those computers are called network nodes. Each node uses cryptography to record every Bitcoin transaction on the Bitcoin blockchain. The Bitcoin blockchain is a public, distributed ledger. Bitcoin can be exchanged for fiat currency, other virtual currencies, products, and services.

26. Tron: Tron is a decentralized, blockchain based platform that allows users to create and exchange digital assets. Transactions on the Tron blockchain are validated and recorded, creating a public ledger similar to other blockchain systems.

27. TRX: TRX is the native cryptocurrency of the Tron network. TRX can be transferred between users, exchanged for other virtual currencies, and used to pay transaction fees. TRX transactions are recorded on the Tron blockchain and are publicly visible, allowing for blockchain tracing similar to

Bitcoin and other virtual currencies.

## V. PROBABLE CAUSE

28. As detailed in the Indictment and supporting affidavits, the scheme generated both cash and virtual-currency proceeds through the operation of the "Montana's Shop" chatroom and the narcotics sales conducted within it. Transactions over approximately $5,000 were typically completed in cash, while smaller sales were conducted using cryptocurrency. Blockchain analysis and records from cryptocurrency exchanges show that, for these transactions, members of the conspiracy commonly generated new wallet addresses for individual sales and then consolidated the funds into centralized wallets. As the cryptocurrency moved through these addresses, it was routed through peel chains and swapping services—such as ChangeNOW[2]—designed to obscure the flow of funds and mask the wallets associated with the conspiracy. This information later proved significant after the DEA seized multiple cellphones from Johnson and his Turlock residence on March 26, 2026.

29. On March 26, 2026, the DEA and partner agencies executed a federal search warrant at 2101 East Linwood Avenue in Turlock, California, the home of Jessy JOHNSON. During the search of this residence, agents seized four cellphones associated to JOHSNON and later examined each phone's contents, revealing evidence that connected the device—and its owner, JOHNSON—to cryptocurrency wallet addresses accessible through an Exodus app on the phones.[3] After identifying the wallet addresses as part of the scheme, DEA computer specialists traced incoming deposits and found that the transactions were entirely consistent with the conspiracy's pattern—specifically, transfers across wallets controlled by the conspiracy, in addition to deposits under $5,000. These transaction amounts are consistent with the aforementioned sub-$5,000.00 deposits.

30. In this investigation, investigators used blockchain tracing software to examine the

[2] ChangeNOW is a non-custodial cryptocurrency swap service that allows users to exchange digital assets without creating an account or depositing funds into a custodial platform. When interacting with ChangeNOW, a user initiates a swap by selecting an input asset, specifying a receiving wallet address, and sending cryptocurrency directly from their self-custody wallet (e.g., Exodus) to a deposit address generated for that specific transaction. ChangeNOW then routes the swap through aggregated liquidity sources—centralized exchanges, decentralized exchanges, and market-maker desks—and delivers the exchanged asset directly to the user's designated wallet. At no time does ChangeNOW retain long-term custody of user funds.

[3] Exodus is a self-custody cryptocurrency wallet service—typically downloaded as a mobile phone app—that allows users to store, send, receive, and swap digital assets while retaining full control of their private keys. Exodus supports hundreds of cryptocurrencies across numerous blockchain networks and includes built-in features such as portfolio tracking and in-wallet swaps.

deposits of cryptocurrency into each of the five addresses subject to seizure (**TBM4**, **TLmg**, **TSbT, TGDY, and TAU6**). Blockchain tracing software, such as Chainalysis, is a common tool available to law enforcement and private companies involved in cryptocurrency transactions. Blockchain tracing software inputs information from the publicly available blockchain ledger of all cryptocurrency transactions and allows for blockchain analysis to be conducted. Blockchain analysis is the process of inspecting, identifying, grouping (clustering), modeling, and visually representing the data on a public blockchain ledger with the goal of discovering useful information about the different actors transacting in cryptocurrency.

31. During a review of the Exodus wallet app, agents observed wallet address **TBM4** as the Tron deposit address within one of the Exodus wallets in a seized cellular telephone. An analysis of wallet address **TBM4** revealed it was active for roughly seven weeks, from February 5, 2026 through March 26, 2026, a time that corresponds with the conspiracy's most active period selling narcotics through its chatroom. During this time period, wallet address **TBM4** received approximately $1,111,063 in cryptocurrency deposits and withdrew approximately $1,111,159, including the 195,856.574417 USDT now subject to seizure. Notably, most of the crypto that went to wallet address **TBM4** was transferred from ChangeNOW and other swapping services the conspiracy used to convert BTC or other cryptocurrencies into USDT. In my experience, narcotics traffickers who receive BTC or other forms of cryptocurrency in exchange for narcotics typically swap those tokens for USDT or other USD-pegged stablecoins because converting stablecoins to USD is significantly easier than converting BTC. Indeed, stablecoins—particularly tokens like USDT—have become the predominant form of cryptocurrency used in illicit transactions, accounting for approximately 84% of on-chain illicit activity in 2025 according to Financial Action Task Force.[4]

32. Wallet address **TBM4** functioned as a central hub address that accumulated narcotics proceeds from numerous incoming blockchain transfers—both large and small—including deposits routed through non-custodial swap services such as ChangeNOW, centralized exchanges like HitBTC, and conversion platforms such as SimpleSwap, before transferring those funds to additional wallet

---

[4] See https://fintechly.com/compliance/fatf-names-stablecoins-the-top-illicit-asset-and-unhosted-wallets-the-weak-link/ (last visited August 13, 2026).

addresses owned and controlled by JOHNSON through his Exodus wallet. Below is a graphic illustrating the central role of wallet address **TBM4** in the DTO's efforts to launder and conceal their narcotics proceeds.




33. During the search of another Exodus wallet downloaded to a seized cellphone, DEA specialists and agents observed that wallet address **TLmg** exhibited cryptocurrency movements similar to those associated with wallet address **TBM4**. An analysis of wallet address **TLmg** showed that it was active during the same general period as wallet address **TBM4**, operating from January 9, 2025, through March 26, 2026, and displaying similar patterns of offsetting inbound and outbound transfers. During that timeframe, wallet address **TLmg** received approximately $164,333 in cryptocurrency and withdrew approximately $164,245 in cryptocurrency, including the 23,498.846459 USDT now subject to seizure.

34. DEA agents also identified a third wallet address within the Exodus app on a seized cellphone. This address, **TSbT**, operated on the TRON network and was initially funded on February 28, 2026, through a transfer of 88.662543 TRX from wallet address **TBM4**. Later that same day, wallet address **TBM4** completed two additional transfers to wallet address **TSbT**: 50 USDT at 20:22 UTC and 150,000 USDT at 20:57 UTC. Based on my training and experience, an initial small transfer followed by a significantly larger transfer is characteristic of a "test" transaction used to confirm functionality before sending a larger, coordinated transfer. Both the 88.662543 TRX and the 150,050 USDT transferred into wallet address **TSbT** remained there when searched by law enforcement and are now subject to seizure.

35. A comprehensive blockchain analysis of wallet address **TBM4** identified a fourth wallet address—**TGDY**—within a locked Exodus app on a seized cellphone. Although DEA agents were unable to unlock the wallet, blockchain tracing showed that wallet address **TBM4** made transfers to wallet address **TGDY** that closely mirrored the pattern observed with wallet address **TSbT**. On March 13, 2026, at 02:30 UTC, **TBM4** sent 51.695259 TRX to wallet address **TGDY**, followed shortly thereafter by a transfer of 50,013.201161 USDT. Based on my training and experience, this sequence—a small initial transfer followed by a significantly larger transfer—reflects the same "test" transaction method used by members of the conspiracy to move their narcotics proceeds. The TRX and USDT transfers into wallet address **TSbT** from JOHNSON's primary wallet address **TBM4** are now subject to seizure.

36. Blockchain analysis further showed that wallet address **TBM4** conducted an outbound transfer on March 24, 2026, at 19:06 UTC of 108,051.756791 USDT to wallet address **TAU6**, which had already received four prior transfers from **TBM4** between February 6, 2026, and March 24, 2026. In total, approximately 148,983 USDT was transferred from **TBM4** to **TAU6** across those five transactions. Additional analysis established further connectivity between wallet address **TAU6** and the conspiracy through a series of transfers from wallet address **TLmg** totaling 30,500 USDT between May 21, 2025 and June 29, 2025. Wallet address **TAU6** held 155,230.461238 USDT as of March 26, 2026—the amount currently subject to seizure.

37. The DEA also identified a Coinbase account associated with JOHNSON that received deposits originating from wallet addresses linked to the MENDOZA DTO. The activity in this Coinbase

account with Universally Unique Identifier (UUID): **5e59**b7c3-3200-5d02-8c71-b4e7952196bc was traced by law enforcement, which revealed connections with the MENDOZA DTO, including wallet-to-wallet linkages similar to those observed among wallets utilized by the DTO (see ¶ 31-36).

38. A Grand Jury subpoena was previously issued to Coinbase regarding the account with UUID: **5e59**b7c3-3200-5d02-8c71-b4e7952196bc. Subpoena results indicated that the owner of **5e59** was Jessy Robert JOHNSON of 2101 E. Linwood Avenue, Turlock, CA, and confirmed via photographs of JOHNSON's California Department of Motor Vehicles-issued driver's license.

39. During the federal search warrant at 2101 E. Linwood Avenue, Turlock, CA (JOHNSON's residence), investigators located a seed phrase beginning with "payment" and "liquid" that was found in an Exodus wallet owned by JOHNSON and was also identified as being illicit proceeds. This wallet contained 0.14688238 BTC (Bitcoin) Valued at $10,048.82. Agents and investigators traced this wallet to connections with the MENDOZA DTO conspiracy and scheme. Case agents believe the funds were in JOHNSON's full control.

40. Also, during the federal search warrant at 2101 E. Linwood Avenue, Turlock, CA, investigators located a seed phrase beginning with "hood" and "craft" that was found in an Exodus wallet owned by JOHNSON and was also identified as being illicit proceeds. This wallet contained 0.14271276 BTC (Bitcoin) Valued at $9,858.02. Agents and investigators traced this wallet to connections with the MENDOZA DTO, using methods and demonstrating wallet-to-wallet linkages similar to those observed among wallets utilized by the DTO (see ¶ 31-36). Case agents believe the funds were in JOHNSON's full control.

41. DEA and partner agencies also executed a federal search warrant at a business associated with the DTO, *Big Tyme Auto Repair* of 1104 East Childs Avenue, Merced, CA. During a search of this property, agents found shipping labels, empty shipping boxes, money counters, cash, and other controlled substances that were indicative of the DTO's money laundering and operating scheme that was previously mentioned in the indictment. While searching the property, agents located a 2021 Polaris RZR, VIN: 3NSR4E928MG629177, License Plate Number FW7P18, with "BIG TYME AUTO REPAIR" wrapped onto the vehicle.

42. A law enforcement check of the registered owner for the 2021 Polaris confirmed the

owner was Jessy Robert JOHNSON of 2101 East Linwood Avenue, Turlock, CA, a member of the MENDOZA DTO and defendant in Case No. 2:26-CR-00045-TLN. As discussed below, members of the MENDOZA DTO would deposit cash into bank accounts controlled by its members and then use those funds to acquire assets. Through this deposit, consolidation, and asset acquisition, members of the MENDOZA DTO, particularly JOHNSON, engaged in a continuous scheme to conceal the nature, source, and ownership of illicit proceeds while promoting and facilitating ongoing financial crimes

43. Bank and financing records show that JOHNSON purchased and financed vehicles in his name or in the name of BIG TYME AUTO, and then rapidly paid down the loan balance using the cash that was deposited into one of the accounts under his control. Once the vehicle loans were substantially or fully satisfied on an accelerated basis through criminal cash proceeds, JOHNSON sold the vehicle, thereby converting the original cash proceeds into funds that appeared to be derived from legitimate sales transactions. An illustration of this financial orchestration is when JOHNSON made accelerated loan payments on the previously seized GMC Sierra. To complete this financial maneuver, JOHNSON transferred funds representing cash deposited into his personal bank account to make regular loan payments of approximately $1,000, followed by several larger payments of approximately $10,000. As a result, the vehicle was paid down to near full ownership in a short period of time and JOHNSON successfully converted the cash from narcotics sales into tens of thousands of dollars in a bank account that directly links back to the sale of a vehicle, distancing JOHNSON from any appearance or connection to narcotics sales.

44. As described above, on or about March 25, 2026, law enforcement obtained seizure warrants for two Wells Fargo bank accounts—ending in 729573299 and 2518584822—associated with Jessy Johnson’s sham automotive business, BIG TYME AUTO. See Case Nos. 2:26-sw-0264 and 0268. Agents later executed the warrants at a Wells Fargo branch in Turlock, California. During execution, Wells Fargo advised that account number 729573299 did not exist in its internal system because it contained only nine digits. The correct account number for BIG TYME AUTO was confirmed to be 7829573299; the second digit (“8”) had been inadvertently omitted. Wells Fargo has frozen the correct account. The probable cause supporting seizure of the account, as established in late March 2026, remains unchanged, and the account is subject to seizure based on its use in narcotics-trafficking and

money-laundering activity.

## VI. CONCLUSION

45. Should these seizure warrants be granted, law enforcement intends to work with Tether to seize the funds associated with the wallet addresses mentioned above holding USDT. In sum, the accompanying warrants would be transmitted to Tether, at which time Tether would "burn" (i.e., destroy) the USDT associated with the addresses at issue. Tether would then reissue the equivalent amount of USDT tokens associated with each wallet address and transfer that equivalent amount of USDT to a government-controlled wallet. The seized currency will remain in the custody of the U.S. government during the entire pendency of the forfeiture proceedings, to ensure that access to, or manipulation of, the forfeitable property cannot be made absent court order or, if forfeited to the United States, without prior consultation by the United States.

46. Based on the foregoing, the assets identified in paragraph four are subject to seizure pursuant to 18 U.S.C. § 981(b) and forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and 981(a)(1)(C), and 21 U.S.C. § 881(a)(6), based on violations of 18 U.S.C. §§ 1956 and 1957 and 21 U.S.C. § 841(a)(1).

Respectfully submitted,

/s/
Peter A. Borges
Special Agent
U.S. Drug Enforcement Administration

Reviewed and approved as to form

/s/ Kevin C. Khasigian
Charles Campbell
Kevin Khasigian
Assistant U.S. Attorneys

Sworn before me and signed telephonically
on this day 14th of August 2026

HON. CAROLYN K. DELANEY
United States Magistrate Judge

# ATTACHMENT A-1

| Wallet Address | 4-Character Reference |
|---|---|
| **TGDY**Ccp3cxpFcrrR52VHUNpSfS8EcTsvkm | **TGDY** |
| **TAU6**5dv1aAZKNZSfxmjP3bq7uBgjaZkQnp | **TAU6** |
| **TSbT**8bxAny77Bt4Hz7fccH6duSz5dmK3Fe | **TSbT** |
| **TBM4**XM16L7vSsG5Kmtc8TktUDriWBswvgT | **TBM4** |
| **TLmg**Z3dfUfMnHBXo83QgrEpLAe6BL3i7Ja | **TLmg** |
| **TSbT**8bxAny77Bt4Hz7fccH6duSz5dmK3F**e** | **TSbT** |
| **TBM4**XM16L7vSsG5Kmtc8TktUDriWBswvgT | **TBM4** |
| **TLmg**Z3dfUfMnHBXo83QgrEpLAe6BL3i7Ja | **TLmg** |

**ATTACHMENT A-2: PROPERTY TO BE SEIZED**

Pursuant to this warrant, Tether International S.A. de C.V. ("Tether") shall provide the law enforcement officer/agency serving this document with the equivalent amount of USDT tokens that are currently associated with the virtual currency addresses referenced below (*i.e.*, 2,153,143 USDT). Tether shall effectuate this process by (1) burning the USDT tokens currently associated with the virtual currency addresses referenced below and (2) reissuing the equivalent value of USDT tokens to a U.S. law enforcement-controlled virtual currency wallet. Tether shall provide reasonable assistance in implementing the terms of these seizure warrants and take no unreasonable action to frustrate its implementation.

- Equivalent amount of USDT as associated with virtual currency addresses:

| Wallet Address |
|---|
| **TGDY**Ccp3cxpFcrrR52VHUNpSfS8EcTsvkm |
| **TAU6**5dv1aAZKNZSfxmjP3bq7uBgjaZkQnp |
| **TSbT**8bxAny77Bt4Hz7fccH6duSz5dmK3Fe |
| **TBM4**XM16L7vSsG5Kmtc8TktUDriWBswvgT |
| **TLmg**Z3dfUfMnHBXo83QgrEpLAe6BL3i7Ja |
| **TSbT**8bxAny77Bt4Hz7fccH6duSz5dmK3Fe |
| **TBM4**XM16L7vSsG5Kmtc8TktUDriWBswvgT |
| **TLmg**Z3dfUfMnHBXo83QgrEpLAe6BL3i7Ja |

# United States District Court

EASTERN District of CALIFORNIA

In the Matter of the Seizure of
*(Briefly describe the property to be seized)*

Approximately 195,856.574417 USDT on the Tron blockchain held at wallet address TBM4XM16L7vSsG5Kmtc8TktUDriWBswvgT.

**WARRANT TO SEIZE PROPERTY SUBJECT TO FORFEITURE**

CASE NUMBER: 2:26-sw-0741 CKD

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests that certain property located in the Eastern District of CALIFORNIA be seized as being subject to forfeiture to the United States of America. The property is described as follows:

**Approximately 195,856.574417 USDT on the Tron blockchain held at wallet address TBM4XM16L7vSsG5Kmtc8TktUDriWBswvgT.**

The property is subject to seizure pursuant to 18 U.S.C. § 981(b), and subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and 981(a)(1)(C), and 21 U.S.C. § 881(a)(6).

I find that the affidavit(s) and any recorded testimony establish probable cause to seize the property.

**YOU ARE COMMANDED** to execute this warrant and seize the property within 14 days in the daytime 6:00 a.m. to 10:00 p.m. You must also give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

An officer present during the execution of the warrant must prepare, as required by law, an inventory of any property seized and the officer executing the warrant must promptly return this warrant and a copy of the inventory to Any U.S. Magistrate Judge in the Eastern District of California.

August 14, 2026 at 3:57 pm
Date and Time Issued

Carolyn K. Delaney
*Judge's signature*

Sacramento, California
City and State

Carolyn K. Delaney, U.S. Magistrate Judge
*Printed name and title*

## RETURN

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|

Inventory made in the presence of:

Inventory of the property taken:

## CERTIFICATION

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: ____________________

____________________
*Executing officer's signature*

____________________
*Printed name and title*

Subscribed, sworn to telephonically, and returned before me this date.

____________________
U.S. Judge or Magistrate

____________________
Date